T.C. Memo. 2010-283

UNITED STATES TAX COURT

TROUT RANCH, LLC, MICHAEL D. WILSON, TAX MATTERS PARTNER,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14374-08.                    Filed December 27, 2010.

<u>Larry D. Harvey</u>, for petitioner.

<u>Sara Jo Barkley</u> and <u>Tamara L. Kotzker</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  By notice of final partnership administrative adjustment (the notice), respondent reduced the amount of the charitable contribution that Trout Ranch, LLC (the partnership), claimed on its 2003 Form 1065, U.S. Return of Partnership Income, from $2,179,849 to $485,000.  Before trial,

we granted respondent's motion to amend his answer to reduce the charitable contribution further to zero--that is, to increase the proposed adjustment from $1,694,849 to $2,179,849. By the notice, respondent also determined that the amount of any resulting charitable contribution deduction is limited to 30 percent of the taxpayer's contribution base and not 50 percent of that base. In 2003, the partnership granted a conservation easement on land it owned. Because the value of that conservation easement determines the amount of the charitable contribution that the partnership may claim, we must determine that value.

Unless otherwise stated, section references are to the Internal Revenue Code in effect for 2003, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all measurements in acres and all dollar amounts to the nearest whole number.

FINDINGS OF FACT

Introduction

Some facts have been stipulated and are so found. The stipulation of facts and the supplemental stipulation of facts, with accompanying exhibits, are incorporated herein by this reference.

When the petition was filed, the partnership's principal place of business was in Gunnison County, Colorado.

Background

The partnership was formed as a limited liability company in October 2002 and elected to be taxed as a partnership for its taxable (calendar) year 2003. In January 2003, the partnership purchased land and certain appurtenant water rights in Gunnison County for $3,953,268. To consolidate the west line of the property, the partnership entered into land trades with neighboring landowners involving adjacent parcels. After those trades, the partnership owned 457 acres of land, including 2 miles of the Gunnison River running north to south through the property. In April 2003, in exchange for $9,700, the partnership conveyed three permanent easements and a temporary easement to the Colorado Department of Transportation (CDOT) encumbering 1 acre (the CDOT easement). A week later, CDOT granted the partnership a State Highway Access Permit over 4 acres (the CDOT access permit). Not counting the land covered by the CDOT access permit, the partnership controlled 453 acres, which we shall refer to as Gunnison Riverbanks Ranch (sometimes, the property). Before 2003, the property had been used for agriculture, recreation, and, during one period, the extraction of gravel. In 2003, approximately 200 acres of the property consisted of hay meadows and pastures.

The east line of the property adjoins several thousand acres managed by the U.S. Department of the Interior, Bureau of Land

Management.  To the north and west of the property are rural residential tracts, most of which are between 2 and 10 acres.  To the south of the property are larger rural residential tracts, all of which are at least 35 acres.

The Gunnison County Land Use Resolution

Gunnison County has no zoning.  The Gunnison County Land Use Resolution (the land use resolution) governs land development and subdivision in Gunnison County.  Two development regulations are important in this case:  the Large Parcel Incentive Process (LPIP) and the Major Impact Project Process (MIP).  Both LPIP and MIP require a developer to submit a plan for approval to the Gunnison County Planning Commission (the commission).  Under LPIP, if a developer preserves at least 75 percent of the land for open space or another conservation purpose, then the developer may subdivide the remaining land into three lots for every 70 acres, rounded down to the nearest whole multiple of 35 acres.[1]  If the developer preserves at least 85 percent of the land, however, then the developer is entitled to a bonus lot for every 140 acres.  In contrast, MIP does not explicitly limit the number of lots into which a developer may subdivide land. Rather, the maximum lot density depends on the physical capacity of the land and the impact the proposed subdivision would have on

---

[1]E.g., using LPIP, a landowner with 140 acres may cluster six homes on lots smaller than 35 acres.

the community. Under MIP, the developer must preserve at least 50 percent of the land. As a matter of right, a developer may subdivide land into 35-acre parcels.

In April 2003, the partnership filed a Land Use Change Permit Application under LPIP proposing to preserve 85 percent of the property to take advantage of the LPIP bonus-density lot provisions. The partnership sought to create 21 residential lots, in addition to a lot for a clubhouse, at Gunnison Riverbanks Ranch (the land use change permit). The partnership also could have filed a Land Use Change Permit Application under MIP for approval to create more than 22 lots.

Development of Gunnison Riverbanks Ranch

From the beginning, the partnership intended to develop Gunnison Riverbanks Ranch into a residential subdivision with a minimum of 20 lots and exclusive shared amenities, including a clubhouse, a guest house, fishing, a riding arena and stable, ponds, a boathouse, duck blinds, and an archery range. (We shall refer to such a development as a shared ranch, in contrast to residential subdivisions without shared amenities.) To the extent possible, the partnership intended to preserve the pristine nature of the land and the river.

In May 2003, the commission formally discussed the land use change permit with the partnership and visited the property. In

July, the commission held a public hearing concerning the land use change permit.

## The Conservation Easement

In December 2003, the partnership donated a conservation easement to the Crested Butte Land Trust encumbering 384 acres at Gunnison Riverbanks Ranch and certain appurtenant water rights (the Trout Ranch CE or, simply, the conservation easement). On the same day, the partnership entered into a Land Conservation Covenant with Gunnison County encumbering an additional 4 acres of the property (the land covenant). Neither the conservation easement nor the land covenant encumbered land that the CDOT easement already encumbered. The remaining unencumbered 66 acres were along the Gunnison River in three parcels. The partnership reserved the right to subdivide those three parcels into 22 lots: 10 lots in the northern parcel, a historic ranch house (the clubhouse) in the middle parcel, and 11 lots in the southern parcel. The 21 single-family residential lots each had 3 acres, with part of each residential lot including land that the conservation easement encumbered. The conservation easement allowed the construction of three open horse shelters, three duck blinds, two corrals, three ponds with docks, a tent platform, and a skeet trap wobble deck on land the conservation easement encumbered.

Subsequent Events

In February 2004, the partnership submitted to the commission its final plan for Gunnison Riverbanks Ranch. In April, the commission approved the land use change permit and the partnership entered into a development agreement with the Board of County Commissioners of Gunnison County. In August, the partnership conveyed the land encumbered by the conservation easement, the land covenant, and the CDOT easement to Gunnison Riverbanks Ranch Association.

The partnership incurred $2,232,485 in expenses to develop Gunnison Riverbanks Ranch.

The Partnership's 2003 Tax Return

On its 2003 Form 1065, the partnership claimed a charitable contribution of $2,179,849 for the contribution of the conservation easement. In March 2008, respondent issued the notice to the partnership. The notice disallowed $1,694,849 of the claimed charitable contribution; i.e., the notice allowed a charitable contribution of $485,000. The notice also determined that a deduction of the charitable contribution was subject to the 30-percent limitation in section 170(b)(1)(B) and not the 50-percent limitation in section 170(b)(1)(A). The Court subsequently allowed respondent to amend his answer to increase the proposed adjustment by $485,000, thereby disallowing the entire charitable contribution.

OPINION

To determine the amount of the charitable contribution made by the partnership, we must determine the value of the conservation easement.

I.  Burden of Proof

In general, the taxpayer bears the burden of proof, although the Commissioner bears the burden of proof with respect to any "increases in deficiency".  See Rule 142(a)(1).  That general rule suggests that respondent bears the burden of proving the partnership is entitled to claim a charitable contribution of less than $485,000 and that petitioner bears the burden of proving the partnership is entitled to claim a charitable contribution of more than $485,000.  Petitioner, however, raises the issue of section 7491(a), which shifts the burden of proof to the Commissioner in certain situations if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability.  Respondent objects that petitioner has failed both to introduce credible evidence under section 7491(a)(1) and to satisfy other preconditions for the application of that section.  It is unnecessary for us to address the parties' disagreements and to determine whether the burden has shifted because the parties have provided sufficient evidence for us to find that the value of the conservation easement was

$560,000. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

II. The Value of the Conservation Easement

A. Introduction

Section 170 allows a deduction for charitable contributions. In general, section 170(f)(3) denies a deduction for a charitable contribution of an interest in property that is less than the taxpayer's entire interest in the property. One exception to that general rule, however, is for a qualified conservation contribution. See sec. 170(f)(3)(B)(iii). Respondent concedes that the donation of the conservation easement was a qualified conservation contribution. The only issue with respect to the donation is its value.

B. Positions of the Parties

The parties defend their respective valuations (through expert and other testimony), and each attacks the valuation offered by his opponent. We briefly describe the analyses of the experts.

1. Respondent's Experts

Michael R. Nash and Louis J. Garone, both experts in real estate appraisal, concluded independently that the conservation easement was worth nothing. They both determined the value of the conservation easement using the so-called income approach to calculate and compare the highest and best use of the property

before and after the imposition of the conservation easement. The income approach to valuing real property involves discounting to present value the expected cashflows from the property. E.g., Marine v. Commissioner, 92 T.C. 958, 983 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). The theory behind the approach is that an investor would be willing to pay no more than the present value of a property's anticipated net income.

### 2. Petitioner's Expert

Jonathan S. Lengel, an expert with respect to the valuation of conservation easements, concluded that the conservation easement was worth $2.2 million. His original report determined the value of the conservation easement by calculating the value of the property before the imposition of the conservation easement using sales of similar properties and then estimating the percentage by which the conservation easement likely decreased the value of the property. Mr. Lengel calculated that percentage by dividing the sale prices of encumbered property by the contemporaneous sale prices of similar unencumbered property. To correct certain errors in his original report and to provide two additional estimates of the value of the conservation easement (using a so-called sales comparison analysis and the

income approach), Mr. Lengel later produced a supplemental report. His ultimate conclusion remained the same.[2]

C. The Proper Valuation Methodology

Section 1.170A-14(h)(3)(i), Income Tax Regs., states in pertinent part:

> The value of the contribution under section 170 in the case of a charitable contribution of a perpetual conservation restriction is the fair market value of the perpetual conservation restriction at the time of the contribution. * * * If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * *

Petitioner argues that, if the condition in the second sentence of that provision is satisfied (i.e., if there is a substantial record of sales of easements comparable to the donated easement), then the only proper valuation methodology is to calculate the fair market value of the donated easement using the sales prices of the comparable easements. Petitioner argues that respondent's experts, who valued the conservation easement using the method described in the third sentence of the provision (the so-called

_____

[2]On brief, petitioner does not rely on Mr. Lengel's original report. We shall not either.

before and after method), violated the "unambiguous" language of the regulation. We need not address that legal issue, however, because we find that the condition in the second sentence of the provision was not in fact satisfied. That is, we find that there was no substantial record of sales of easements comparable to the donated easement. The use of the before and after method (by all three experts) to value the conservation easement was thus proper and in accordance with the regulation.

D. Mr. Lengel's Sales Comparison Analysis

Petitioner argues that, according to section 1.170A-14(h)(3)(i), Income Tax Regs., the "only mandatory methodology" for the valuation of a conservation easement is the methodology described in the second sentence of that provision (the sales comparison method). In the sales comparison analysis in his supplemental report, Mr. Lengel relies on five sales of conservation easements in Gunnison County. On brief, petitioner relies on only four of those sales, disregarding a fifth sale that occurred after the partnership donated the conservation easement.[3] Nonetheless, none of the other four conservation easements is comparable to the Trout Ranch CE. For that reason, we find Mr. Lengel's sales comparison analysis to be of no help

---

[3]That is consistent with petitioner's argument that the Court should not consider any evidence not available before the donation of the conservation easement because such evidence cannot be relevant to the value of the conservation easement. We address that argument in sec. II.E.2.d.(2)(c) of this report.

in determining the value of the conservation easement.  We discuss the four conservation easements below.

### 1.  The Niccoli Conservation Easement

In April 2001, as part of a bargain sale, Robert Niccoli conveyed to Colorado Cattlemen's Agricultural Land Trust, a Colorado nonprofit corporation, a conservation easement encumbering 146 acres of primarily open ranchland.  There are no water rights associated with the property, and there was no creek or river frontage.  The Niccoli property was about 4 miles southeast of Crested Butte, directly west of the Crested Butte South subdivision, and about 12 miles north of Gunnison Riverbanks Ranch.  Both the Niccoli property and Gunnison Riverbanks Ranch abutted Colorado State Highway 135.  The Niccoli conservation easement (Niccoli CE) precluded any development on the Niccoli property.  That is, the Niccoli property went from at least four 35-acre lots to none.  In the bargain sale, Mr. Niccoli received $695,296 from Great Outdoors Colorado Trust Fund, a State agency that provides money to Colorado land trusts and local governments to acquire conservation easements.  The appraised value of the Niccoli CE was $927,061.

### 2.  The Guerrieri Conservation Easement

In November 2003, as part of a bargain sale (with the grantor receiving land), Guerrieri Ranches, L.L.C., conveyed to Gunnison Ranchland Conservation Legacy, a Colorado land trust and

nonprofit corporation, a conservation easement encumbering 320 acres of primarily open ranchland. The Guerrieri conservation easement (Guerrieri CE), however, did not cover the entire Guerrieri property, which was 952 acres. The Guerrieri CE encumbered the northern section of the irregular Guerrieri property, which was connected to the greater Guerrieri property only by a relatively narrow strip of land. The Guerrieri property, irrigated and with creek frontage, is 11 miles north of Gunnison Riverbanks Ranch. The Guerrieri CE precluded any development on 315 acres of 320 encumbered acres; the remaining 5 acres were reserved for one single-family residence. That is, the Guerrieri property went from at least twenty-three 35-acre lots to at least fourteen or fifteen 35-acre lots and one 5-acre lot. In the bargain sale, Guerrieri Ranches, L.L.C., received land in Gunnison County worth $938,475 from Gunnison Ranchland Conservation Legacy. The appraised value of the Guerrieri CE was $1,248,750.

### 3. The Miller Conservation Easement

In November 2003, as part of a bargain sale (with the grantor receiving land), Miller Land and Cattle conveyed to Gunnison Legacy Fund, a Colorado land trust and nonprofit corporation, a conservation easement encumbering 360 acres of primarily open ranchland. The Miller property was irrigated. The Miller conservation easement (Miller CE) precluded any

development on 355 acres of the Miller property; the remaining 5 acres were reserved for one single-family residence. That is, according to the contemporaneous appraisal, the Miller property went from nine 40-acre lots to one 5-acre lot. In the bargain sale, Miller Land and Cattle received land in Gunnison County worth $711,000 from Gunnison Legacy Fund. The appraised value of the Miller CE was $984,600.

4. The Trampe Conservation Easement

In December 2003, as part of a bargain sale, Trampe Ranches, L.L.L.P., conveyed to Colorado Open Lands, a Colorado land trust and nonprofit corporation, a conservation easement encumbering 978 acres of primarily open ranchland. The Trampe property contains 1.5 miles of the East River. The Trampe property was just north of Almont, about 3 miles north of Gunnison Riverbanks Ranch. Both the Trampe property and Gunnison Riverbanks Ranch abutted Colorado State Highway 135. The Trampe conservation easement (Trampe CE) precluded any development on 973 acres of the Trampe property; Trampe Ranches, L.L.L.P., retained the right to build one single-family residence on one of three 5-acre lots. That is, the Trampe property went from at least twenty-seven 35-acre lots to one 5-acre lot. In the bargain sale, Trampe Ranches, L.L.L.P., received $235,000 from Colorado Open Lands. The appraised value of the Trampe CE was $1,735,500.

5. Discussion

The most obvious problem with Mr. Lengel's comparable sales analysis is that none of the four conservation easements above had an effect on the donor's land comparable to the effect the Trout Ranch CE had on Gunnison Riverbanks Ranch.[4]  With the exception of the Guerrieri CE, the conservation easements restricted development rights to a much greater extent than the Trout Ranch CE.  The Niccoli CE restricted development from at least four residential lots to none (a reduction of potential development of 100 percent); the Miller CE restricted development from nine residential lots to one lot (a reduction of potential development of 89 percent; the Trampe CE restricted development from 27 residential lots to one lot (a reduction of potential development of 96 percent).  In essence, in all three cases the conservation easements all but eliminated residential development.  In stark contrast, the Trout Ranch CE restricted development from at least 40 residential lots to 22 lots (a reduction in potential development of 45 percent).  We are simply not convinced that the value of a conservation easement that

_____

[4]There are other problems.  For one, Mr. Lengel used the appraised value of each conservation easement as its "sales price".  Given that the sales described above were bargain sales, in which the purchaser paid less than the appraised value, we question the propriety of his implicit assumption that the appraised values were indicative of what a purchaser would pay absent the implicit gift by the seller.  Nonetheless, we need not find the true value of any of the four conservation easements because we find that none was comparable to the Trout Ranch CE.

restricts development to at most one residential lot sheds any light on the value of a conservation easement that allows as many as 22 residential lots.

Although the Guerrieri CE and the Trout Ranch CE restricted overall development to a similar degree, the details of the former are too different from those of the latter for the Guerrieri CE to be of much help in valuing the Trout Ranch CE. Regardless of the true value of the Guerrieri CE, that conservation easement provides no help in valuing the Trout Ranch CE because the restrictions of the two conservation easements had significantly different effects. The Guerrieri CE restricted all development across a block of 315 acres (the single 5-acre residential lot being in the northeast corner of the 320 encumbered acres). The appraisal stated: "There are several successful residential developments within the subject neighborhood along with sales of 35-acre parcels for homes and large ranches for development and exclusive use." The conservation easement prevented Guerrieri Ranches, L.L.C., from developing 320 acres of "semi-secluded pristine valley, with creek frontage, views, majestic mountains, wildlife, [and] proximity to economic centers". At Gunnison Riverbanks Ranch, however, the conservation easement restricted the land surrounding the most valuable asset (the river) but was designed to allow the partnership to develop the entire parcel into a 21-

lot shared ranch, with 21 residential lots and a clubhouse along the river.

The two conservation easements thus had greatly different effects on the surrounding land. Whereas the appraisal of the Guerrieri CE stated that the conservation easement would provide "no specific benefit" to the rest of the Guerrieri property, the Trout Ranch CE provided a clear benefit to the unencumbered land along the river. We simply do not consider the Guerrieri CE comparable to the Trout Ranch CE. Moreover, even if the Guerrieri CE were comparable, the record of a single comparable conservation easement would be insufficient to constitute "a substantial record of sales of easements comparable to the donated easement". See sec. 1.170A-14(h)(3)(i), Income Tax Regs.

E. The Before and After Analyses

1. Introduction

All three experts agreed that the highest and best use of Gunnison Riverbanks Ranch before and after the granting of the conservation easement was as a residential subdivision, and they all used the income approach to calculate the before and after values of the property. Given the lack of comparable market sales, we agree that the income approach is the most appropriate method to value the property. To calculate the before and after values, the experts used the so-called subdivision method; to find the present value of the hypothetical residential

subdivisions, they constructed discounted cashflow analyses by estimating the number and prices of the lots, the costs of their development and sale, and other parameters. We find none of the experts completely convincing. We shall discuss their assumptions and their arguments, and we shall then construct our own discounted cashflow analyses to calculate the before and after values of the property.

For a couple of reasons, we start by calculating the present value of the property after the imposition of the conservation easement. First, the experts spent the most time and effort calculating the after value of the property, and their competing analyses lead to their most substantial disputes. Our analysis depends on resolving those disputes, and we can more coherently address them in their original context. Second, the presence of the conservation easement would have no effect on several parameters we must estimate; that is, several parameters should remain constant in the calculations of the before and after values. In choosing those parameters, we want to consider the arguments of all three experts. Mr. Nash, however, used only a single discounted cashflow analysis to support his after value. (Mr. Nash used a sales comparison approach and a cost approach to calculate his before value, which was less than his after value.) That is, unlike the other experts, he did not use multiple discounted cashflow analyses to compare different developments.

Nonetheless, his report is in evidence, and we find some of his analysis of the after value helpful. By calculating the after value first, we can evaluate his parameters in their original context.

   2. <u>The After Value</u>

 Because Messrs. Nash and Garone found that the imposition of the conservation easement did not change the highest and best use of the property, their respective analyses of the before value and the after value are identical. Mr. Nash found the highest and best use to be a development identical to Gunnison Riverbanks Ranch--i.e., a 21-lot shared ranch. He valued that development at $5.8 million. Mr. Garone found the highest and best use to be a 22-lot residential subdivision. He valued that development at $5.08 million. Mr. Lengel, like Mr. Nash, found the highest and best use after the imposition of the conservation easement to be a development identical to Gunnison Riverbanks Ranch--i.e., a 21-lot shared ranch. He, however, valued that development at $2.6 million.

 All the discounted cashflow analyses we discuss had the following basic structure. To calculate gross sales revenue, the experts estimated the prices of the lots, their absorption rate (i.e., the number of lots that would sell every year), and their appreciation rate. To calculate expenses, the experts estimated capital expenses (i.e., the development costs, all expended in

the first year), the sales expenses (e.g., sales commissions and general and administrative costs), and developer's profit (for convenience, a percentage). The experts also estimated a discount rate (i.e., the interest rate used to determine the present value of the future cashflows). With their estimates, the experts then calculated the present value of the future cashflows, and thus the present value of the proposed development. We discuss their discounted cashflow analyses below, and then we construct our own.

a. <u>Mr. Nash</u>

The discounted cashflow analysis Mr. Nash used to calculate the value of the 21-lot shared ranch had the following parameters. Mr. Nash estimated that the lots would sell for $630,000 (before appreciation) over 6 years (at a rate of 0, 5, 4, 4, 4, 4). He estimated the lots would appreciate at 4 percent (but for some reason starting only in the second year). He estimated that capital expenses would be $1.51 million, that sales expenses would be 9 percent of gross sales revenue (i.e., commissions of 8 percent and closing costs of 1 percent), and that developer's profit would be 25 percent. (Mr. Nash did not explicitly estimate project management expenses. We offer an explanation for that apparent oversight in section II.E.2.d.(8) of this report.) For "sensitivity testing", he used discount

rates of 9, 10, and 11 percent, and he ultimately settled on a discount rate between 9 and 10 percent.

### b. Mr. Garone

The discounted cashflow analysis Mr. Garone used to calculate the value of the 22-lot residential subdivision had the following parameters. Mr. Garone estimated that the lots would sell for $550,000 (before appreciation) over 8 years (at a rate of 3, 3, 3, 3, 3, 3, 3, 1). He estimated the lots would appreciate at 8 percent. He estimated that capital expenses would be approximately $805,000, that project management expenses would be 10 percent of gross sales revenue, that sales expenses would be 8.5 percent of gross sales revenue (i.e., commissions of 7 percent and closing costs of 1.5 percent), and that developer's profit would be 15 percent. He used a discount rate of 15 percent.

### c. Mr. Lengel

The discounted cashflow analysis Mr. Lengel used to calculate the value of the 21-lot shared ranch had the following parameters. Mr. Lengel estimated that the lots would sell for $300,000 (before appreciation) over 4 years (at a rate of 4, 8, 8, 1). He estimated the lots would appreciate at 15 percent. He estimated that capital expenses would be approximately $2.18 million, that project management expenses would be $40,000 a year, that sales expenses would be 7 percent of gross sales

revenue (i.e., commissions of 6 percent and closing costs of 1 percent), and that developer's profit would be 12 percent. He used a discount rate of 15 percent.

### d. Analysis

#### (1) Number of Lots

We agree with Messrs. Lengel and Nash that the highest and best use of the property after the imposition of the conservation easement was a 21-lot shared ranch. The implicit assumption is that the clubhouse would increase the value of the other lots by more than the value of an additional lot and the cost of the clubhouse itself. That assumption does not strike us as implausible, especially given that the partnership in fact developed Gunnison Riverbanks Ranch as a 21-lot shared ranch. Because Mr. Garone failed to explain exactly why he placed such a low value on the clubhouse, we find that a 21-lot shared ranch was the highest and best use after the imposition of the conservation easement.

#### (2) Lot Prices

#### (a) The Experts' Estimates

The experts broadly disagreed about lot prices. Indeed, the value of the lots after the imposition of the conservation easement is their essential dispute. Mr. Lengel assumed that all 21 lots would sell for $300,000. Mr. Lengel relied on six lot sales at Hidden River Ranch to support his lot price of $300,000.

(We discuss the experts' data in the next section.) Yet Mr. Lengel himself abandoned that estimate in his rebuttal reports. In those reports, Mr. Lengel stated that "a reasonable conclusion given the data available" was, using Mr. Nash's data, $355,000 and, using Mr. Garone's data, $375,000. We are not surprised that Mr. Lengel did not defend his estimate. In his analysis of the property before the imposition of the conservation easement, Mr. Lengel found that a 40-lot residential subdivision was the highest and best use. Mr. Lengel assumed that 40 lots, distributed across roughly the same 15 to 20 percent of the property as 21 lots, would also sell for $300,000. Mr. Lengel apparently assumed either that the 40 lots would not sell at a discount or that the 21 lots would not sell at a premium. We find his assumption that lot prices would remain the same regardless of the number of lots implausible. (His estimate of $300,000 per lot is somewhat more reasonable, however, for a 40-lot residential subdivision. See sec. II.E.3.c.(1) of this report.) Notably, in the rebuttal reports, Mr. Lengel accepted all the other assumptions that Messrs. Nash and Garone made.

Mr. Nash assumed that all 21 lots would sell for $630,000. To arrive at that figure, he used 13 lot sales from three different developments in the area. Mr. Nash considered three sales from Eagle Ridge Ranch, six sales from Hidden River Ranch, and four sales from Gunnison Riverbanks Ranch.

Mr. Garone assumed that all the lots (22 in his analysis) would sell for $550,000. To arrive at that figure, he scaled down the lot price from his 12-lot residential subdivision (which assumed a matter-of-right subdivision into 35-acre lots) by approximately 12 percent. We find that approach unsatisfactory. We shall simply use the raw data from which he derived the lot price for his 12-lot residential subdivision. Mr. Garone used nine lot sales from four different developments in the area. He considered three sales from Danni Ranch, three sales from Hidden River Ranch, one sale from Eagle Ridge Ranch, and two sales from Horse River Ranch.

(b) The Experts' Data

With respect to lot sales at Hidden River Ranch, the experts offer slightly different accounts. We find the facts of those sales to be the following. Hidden River Ranch comprised 260 acres approximately 4 miles south of Crested Butte, which included half a mile of the East River. Amenities included a barn, corrals, and 171 acres of open space protected by a conservation easement. The remaining 89 acres had 17 lots of approximately 5 acres each. Two lots sold in July 2003 for $431,000, one lot sold in December 2003 for $300,000, and three lots sold in April 2004 for $320,000, $325,000, and $335,000.

Mr. Nash compared Hidden River Ranch to Gunnison Riverbanks Ranch, describing its location (close to Crested Butte) as

"slightly superior", the size of its lots (which he believed to be 35 acres) as "slightly superior", and its aesthetic appeal and amenities (e.g., inferior tree cover and a shorter stretch of river with an inferior fishery) as "significantly inferior". Overall, he judged Hidden River Ranch to be "slightly inferior" to Gunnison Riverbanks Ranch. In his supplemental report, Mr. Lengel presented an almost identical analysis, calling Hidden River Ranch "slightly superior in size and location * * * but along a substantially inferior river".[5] Nonetheless, given that only a single lot at Hidden River Ranch sold for as little as $300,000, Mr. Lengel evidently concluded that Gunnison Riverbanks Ranch was inferior to that development. Mr. Garone concluded that, because of the inferior East River fishery, Hidden River Ranch lots would, after otherwise adjusting their values to reflect differences with Hidden River Ranch lots, be worth approximately $50,000 less than lots at Gunnison Riverbanks Ranch.

Eagle Ridge Ranch comprised 4,900 acres approximately 7 miles northwest of Gunnison, which included 2 miles of the Ohio Creek. Amenities included two mountain cabins, a barn, corrals and equestrian facilities, and 4,375 acres of open space (including 2,000 acres of "mountainous lands"). The remaining

---

[5]Messrs. Lengel and Nash apparently judged slight superiority in size differently. Or else slight superiority in size covers a vast range.

525 acres had 15 lots of 35 acres each.  One lot sold in January 2005 for $845,000, one lot sold in December 2005 for $985,000, and one lot sold in November 2006 for $875,000.

In comparison to Gunnison Riverbanks Ranch, Mr. Nash described the location of Eagle Ridge Ranch as under "less development pressure" and so "slightly inferior", the size of its lots as "slightly superior", and its aesthetic appeal and amenities (e.g., similar tree cover, a river with an inferior fishery, and a much lower density) as "slightly superior". Overall, he judged Eagle Ridge Ranch to be "moderately superior" to Gunnison Riverbanks Ranch.  Mr. Garone described the Eagle Ridge Ranch amenities as "superior" and estimated that its lots were worth 25 percent more than those at Gunnison Riverbanks Ranch.  Mr. Lengel did not discuss Eagle Ridge Ranch.

Mr. Garone did not provide much background on Danni Ranch or Horse River Ranch.  At Danni Ranch, one 35-acre lot sold in October 2000 for $375,000, one 39-acre lot sold in November 2004 for $385,000, and one 35-acre lot sold in March 2005 for $450,000.  The first lot, like the lots at Hidden River Ranch, was on the "inferior" East River.  The second two lots did not have river frontage.  At Horse River Ranch, one 35-acre lot sold in January 2004 for $575,000 and one 35-acre lot sold in April 2004 for approximately $465,000.  Both lots were on the Ohio Creek, which Mr. Garone considered even less desirable than the

East River.  Mr. Garone concluded that, because of the inferior Ohio Creek fishery, Horse River Ranch lots were worth approximately $75,000 less than Gunnison Riverbanks Ranch lots.

The following is a summary of lot sales at Gunnison Riverbanks Ranch after the donation of the conservation easement:

| Date | Lot No. | Price |
|------|---------|-------|
| December 2004 | 16 | $625,000 |
| December 2004 | 17 | 625,000 |
| August 2006 | 21 | 500,000 |
| November 2006 | 16 | 677,000 |
| August 2007 | 3 | 640,000 |
| November 2007 | 1 | 685,000 |
| April 2008 | 7 | 800,000 |

The lot sold in August 2006 did not have river frontage.

### (c)   The Use of Postvaluation Data

Before we discuss the data presented above, we must address petitioner's argument that we may not consider evidence of lot sales after the date of valuation (i.e., the date the partnership donated the conservation easement).  Petitioner argues that "the plain language of the regulation" makes events occurring after the date of valuation "irrelevant".  In support, he quotes section 1.170A-14(h)(3)(i), Income Tax Regs.:  "The value of * * * a perpetual conservation restriction is * * * [its] fair market value * * * at the time of the contribution."  That statement, however, does not limit the evidence one may consider in determining that value; the regulation does not support petitioner.

In Estate of Gilford v. Commissioner, 88 T.C. 38, 52-54

(1987), on which petitioner relies, we stated:

> The rule that has developed, and which we accept, is that subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation. See, e.g., Ithaca Trust Co. v. United States, 279 U.S. 151 (1929) * * *
>
> \*       \*       \*       \*       \*       \*       \*
>
>     * * * the rule against admission of subsequent events is a rule of relevance. Rule 401, Federal Rules of Evidence, applicable in this Court pursuant to Rule 143, Tax Court Rules of Practice and Procedure, and section 7453, defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." (Emphasis added.) See Armco, Inc. v. Commissioner, 87 T.C. 865 (1986). * * *

Estate of Gilford does not support petitioner. We find that the

evidence of lot sales within a reasonable period after the date

of valuation (especially those at Gunnison Riverbanks Ranch

itself) tends to make a given estimate of the lot prices more or

less likely; that is, such evidence is relevant.[6]

Petitioner argues that, even if such evidence is relevant,

we should give it no weight, because between June 2004 and June

2006 "Gunnison County real property appreciated overall" by 53

---

[6]Indeed, in the case of valuation for stocks and bonds for estate and gift tax purposes, where the standard is also fair market value, and there may be no sales on the appropriate valuation date, the regulations specifically contemplate the use of sales data within a reasonable period both before and after the valuation date to determine value on that date. Sec. 20.2031-2(b), Estate Tax Regs.; sec. 25.2512-2(b), Gift Tax Regs.

percent.  Moreover, petitioner argues that, in those 2 years, vacant land in Gunnison County appreciated by 87 percent. Respondent objects that Gunnison County comprises many different economic areas, including the towns of Gunnison and Crested Butte and the area surrounding the latter's ski resorts.  Respondent argues that the Gunnison economic area, which included Gunnison Riverbanks Ranch, experienced only, in the words of a senior appraiser for the Gunnison County Assessor's Office, "a minor upward adjustment."  According to that senior appraiser, the sale of the Crested Butte mountain caused "an increase in market volume and market prices" in Crested Butte and the area surrounding the ski resorts.  (Although that sale did not occur until March 2004, the purchasers of the Crested Butte Ski Resort signed a letter of intent in October 2003.)  Petitioner does not suggest that any lot sales (with the notable exception of lot sales at Gunnison Riverbanks Ranch) support the proposition that prices of real estate in and around the town of Gunnison appreciated at more than a reasonable rate.  We find no evidence that the lots at Gunnison Riverbanks Ranch appreciated at more than a reasonable rate after the date of valuation.  Nonetheless, we shall give the most weight to lot sales within a year of the date of valuation (i.e., sales in 2003 and 2004) and less weight to lot sales outside that range.

(d)  Analysis of the Data

We are not convinced that the prices of the 35-acre lots at Danni Ranch, Horse River Ranch, and Eagle Ridge Ranch tell us much about the lot prices at Gunnison Riverbanks Ranch.  Danni Ranch and Horse River Ranch are complete unknowns.  We are reluctant to draw any conclusion from the lot sales at those two developments.  Eagle Ridge Ranch was almost completely different from Gunnison Riverbanks Ranch:  Eagle Ridge Ranch had fewer and much larger lots, in a more secluded area, with superior amenities.  We are certain (and the experts all agreed) that those lots were worth far more than lots at Gunnison Riverbanks Ranch, but exactly how much more is not clear.

We shall rely on the sales at Hidden River Ranch and Gunnison Riverbanks Ranch.  We find that lots at Hidden River Ranch were much less desirable than lots at Gunnison Riverbanks Ranch.  Mr. Nash called the East River "significantly inferior", and even Mr. Lengel called it "substantially inferior".  Given that both parties stress the beauty of the Gunnison River and the quality of its fishery, we find the difference between the two rivers to be important.  The sales data suggest that Hidden River Ranch had two tiers of lots:  those worth around $430,000 and those worth around $320,000.  (The experts offered no explanation for the significant difference in prices.)

We also find the two lot sales at Gunnison Riverbanks Ranch in December 2004 to be important. Nonetheless, we are wary of relying too much on the sale prices of $625,000, which is the sale price 1 year after the December 2003 donation of the Trout Ranch CE. Mr. Garone suggested adding at least $50,000 to the prices of lots at Hidden River Ranch to estimate the prices of lots at Gunnison Riverbanks Ranch. We shall add $60,000 to the top-tier lots at Hidden River Ranch to estimate the price of the average lot at Gunnison Riverbanks Ranch. That strikes us as a reasonable (indeed, a generous) compromise: Our estimate suggests that appreciation over 1 year was almost 30 percent. Although petitioner failed to present any evidence of such appreciation, we must reconcile the sales data before us. We shall thus use $490,000 as the price of lots.

### (3) Absorption

The experts again broadly disagreed. Mr. Lengel estimated a rapid absorption rate. He stated that, in 3 years, Hidden River Ranch had sold six lots with river frontage. He argued that, given the limited supply of similar lots and the anticipated competition for lots at Gunnison Riverbanks Ranch, the absorption rate there would be much higher. Mr. Garone stated that developments with lots between $400,000 and $550,000 had absorption rates of about three lots a year. Mr. Nash also considered lot sales at Hidden River Ranch, but he did not limit

himself to lots with river frontage.  He stated that Hidden River Ranch had sold 14 lots in 3 years, but that, given the higher lot prices at Gunnison Riverbanks Ranch, he estimated slightly slower absorption.[7]

We agree with the analyses of Messrs. Lengel and Nash. Whereas Mr. Garone failed to justify his sluggish absorption rate, they provided data in support of their estimates.  Yet we agree with Mr. Garone that Mr. Lengel's absorption rate--with eight sales in each of the first 2 years--seems "slightly aggressive".  We find that Mr. Lengel's arguments do not justify his own estimates but do support those of Mr. Nash.  We shall adopt the absorption rate of four to five lots a year that Mr. Nash proposed.  We assume, as did all the experts, that the first sales are in 2004 (the year after the year of the contribution of the Trout Ranch CE).

### (4)  Appreciation

With respect to appreciation, Mr. Lengel stated that "The rate of increase in selling prices is difficult to * * * [predict]."  He suggested that, at the time of the donation of the conservation easement, because demand had been low for the few years before, one might have expected demand to increase in

---

[7]We presume the experts did not consider the actual absorption of lots at Gunnison Riverbanks Ranch because many of the partners, who each received at least one lot, were interested in building homes for themselves, not in selling to others.

the future.  He reasoned that, with only a "small supply of vacant river front lots between one and ten acres in the neighborhood" and "no known new developments * * * planned", rising demand "should lead to escalating values."  He noted that, historically, similar properties generally appreciated between 5 and 20 percent a year.  Mr. Lengel concluded that the lots would appreciate at 15 percent a year for the first 4 years and would stop appreciating thereafter.  Looking to the "sluggish economy and historical performance in the area" at the time of the donation of the conservation easement, Mr. Garone estimated appreciation of 8 percent a year.  Relying solely on the sale and resale of lot 16 at Gunnison Riverbanks Ranch, Mr. Nash estimated appreciation of 4 percent.

Bearing in mind Mr. Lengel's initial caveat ("The rate of increase in selling prices is difficult to portend"), we find the assumption that appreciation would not be uniform unwarranted. There is no evidence that the property would either not appreciate in the first year or abruptly stop appreciating after 4 years.  Although Mr. Lengel's analysis does not justify appreciation of 15 percent, we do find that his reasons justify appreciation of more than 8 percent.  We shall use flat appreciation of 10 percent a year.

### (5)  Capital Expenses

To calculate capital expenses, all three experts started with the actual expenses the partnership incurred developing the property (approximately $2.23 million) and subtracted certain expenses and related interest.  Mr. Lengel subtracted one expense (a finder's fee for petitioner), which left him with development costs of approximately $2.18 million.  Mr. Nash subtracted six additional expenses (related to the conservation easement, the land swaps, the ranch house, and the barn), which left him with development costs of approximately $1.40 million.  Mr. Garone subtracted several more expenses (e.g., related to the digging of "Lakes and Ditches"--the ponds, we presume), which left him with development costs of approximately $805,000.  Because we have already rejected Mr. Garone's 22-lot residential subdivision, we shall not consider his proposed development costs for that plan. Mr. Garone, however, also estimated costs for a syndicated plan, intended to reflect a shared ranch similar to the actual Gunnison Riverbanks Ranch.  For that estimate, he subtracted far fewer costs (i.e., not those related to the clubhouse), which left him with development costs of approximately $1.77 million.  Messrs. Nash and Garone, however, failed to explain why they excluded certain costs.  (Mr. Nash characterized the costs he excluded as "abnormal costs * * * not typical for most subdivision developments" yet failed to acknowledge that those costs may have

increased the value of property).  Given respondent's insistence that the partnership developed the land according to its highest and best use, we find his experts' reasons for excluding some of its costs lacking.  We shall use Mr. Lengel's estimate of capital expenses of approximately $2.18 million.

### (6)  Project Management Expenses

Mr. Lengel allocated $40,000 a year for "marketing and advertising".  Mr. Garone, however, stated that project management expenses would also include "project oversight" costs and "miscellaneous administrative costs".  We find that Mr. Lengel underestimated project management expenses.  We shall adopt Mr. Garone's estimate of project management expenses (10 percent of gross sales revenue).

### (7)  Sales Expenses

Mr. Lengel stated that "real estate agents charge 5 percent to 10 percent commissions on vacant land sales."  He then stated that, because potential buyers of real estate in Gunnison County come from a "wide geographical range", "marketing costs * * * extend out of the immediate area."  Mr. Lengel concluded that real estate agents would charge a commission of 6 percent--that is, a low commission--to cover those marketing costs.  Mr. Garone proposed a commission of 7 percent, and, given that Mr. Lengel's own analysis supports such a figure, we shall adopt it.  Mr. Garone, however, did not suggest any reason that closing costs

would exceed 1 percent, so we shall assume closing costs of 1 percent, as Messrs. Nash and Lengel do.  We find the figure Mr. Nash used for commissions to be slightly high and without much support.  Moreover, a survey attached as an appendix to Mr. Lengel's supplemental report (the Winter 2002/2003 Real Estate Investment Survey for the Rocky Mountain Region) concluded that, according to 25 real estate brokers, developers, lenders, real estate appraisers, and consulting firms, total sales expenses of 8 percent were reasonable for sales of vacant land worth up to $1 million.  We shall use sales expenses of 8 percent of gross sales revenue.

(8)  Developer's Profit

Mr. Lengel stated that "Developers typically require or anticipate profits ranging from 15 percent (usually for short term development projects with a minimum of well identified risk factors) to 50 percent or more for longer term, more hazardous projects."  Mr. Lengel stated that one Colorado developer "typically anticipates at least a 20 percent profit for 'subdivision' development."  He then claimed that "Interviews with developers in resort areas of Colorado revealed only that they anticipate a 15 to 40 percent profit".  Mr. Lengel then inexplicably concluded that the developer would require a profit of only 12 percent.  Given that 12 percent was not even within his own range, and because Mr. Lengel provided no reason the

range was inappropriate, we cannot accept that figure.  Mr.
Garone suggested 15 percent.  Mr. Nash suggested 25 percent.  We
recall that Mr. Nash did not incorporate project management
expenses into his analysis.  We believe that he rolled those
costs into his estimate of developer's profit.  We have found
project management expenses to be 10 percent of gross sales
revenue.  See sec. II.E.2.d.(6) of this report.  We shall assume
a developer's profit of 15 percent.[8]

### (9)  Discount Rate

Mr. Lengel stated that "An appropriate discount rate
reflects competitive rates of return on similar investments."  He
referred to a survey (the Winter 2002/2003 Real Estate Investment
Survey for the Rocky Mountain Region) attached to his
supplemental report as an appendix in which 25 real estate
brokers, developers, lenders, real estate appraisers, and
consulting firms opined as to the discount rates they anticipated
and used for residential land development.  Their figures ranged
from 10 to 15 percent.  Mr. Lengel concluded that 15 percent was
appropriate.  Mr. Garone cited two different surveys, with
discount rates ranging from 10 to 30 percent.  He stated that, at
the time of the donation, the anticipated selling period was long

---

[8]Both Messrs. Garone and Nash applied their profit
percentages to projected gross sales revenue (both in determining
their after and their before values) rather than to projected net
revenue from sales, as did Mr. Lengel.  We shall follow the lead
of Messrs. Garone and Nash.

(9 years), the "demand for finished housing" was low, and the area had a sufficient supply of residential lots. For those reasons, he considered the project to be "relatively higher risk". Nonetheless, he chose a discount rate of 15 percent. Mr. Nash chose a discount rate of approximately 10 percent, but he failed to offer much support. Messrs. Lengel and Garone agreed, and we find their evidence and their reasons convincing. We shall adopt their discount rate of 15 percent.

### e. Conclusion

We conclude that the 21-lot shared ranch had, at the time of the donation of the conservation easement, a present value of approximately $3.89 million. See the appendix for our discounted cashflow analysis.

### 3. The Before Value

Mr. Lengel found the highest and best use of the property before the imposition of the conservation easement to be a 40-lot residential subdivision. He valued a 40-lot residential subdivision at $5.6 million. Mr. Garone valued a 40-lot residential subdivision at $3.22 million. We discuss their discounted cashflow analyses, and then we construct our own.

### a. Mr. Lengel

The discounted cashflow analysis Mr. Lengel used to calculate the value of the 40-lot residential subdivision had the following parameters. Mr. Lengel estimated that the lots would

sell for $300,000 over 9 years (at a rate of 0, 8, 8, 6, 5, 4, 3, 3, 3).  He estimated the lots would appreciate at 15 percent for 4 years and then stop appreciating.  He estimated that capital expenses would be $2.55 million, that project management expenses would be $40,000 a year, that sales expenses would be 7 percent of gross sales revenue (i.e., commissions of 6 percent and closing costs of 1 percent), and that developer's profit would be 12 percent.  He used a discount rate of 15 percent.

Mr. Lengel also stated that a conservation easement protecting the river corridor could be sold in the first year for $1.5 million.

### b.  Mr. Garone

The discounted cashflow analysis Mr. Garone used to calculate the value of the 40-lot residential subdivision had the following parameters.  Mr. Garone, like Mr. Lengel, estimated that all the lots would sell in 9 years.  Mr. Garone, however, estimated three different prices for three different kinds of lots; he estimated that 18 "buffer" lots would sell for $200,000 each (at a rate of 0, 3, 3, 2, 2, 2, 2, 2, 2), that 12 "west river" lots would sell for $300,000 each (at a rate of 0, 2, 1, 2, 1, 2, 1, 2, 1), and that 10 "east river" lots would sell for $400,000 each (at a rate of 0, 1, 2, 1, 2, 1, 2, 1, 0).  He estimated the lots would appreciate at 8 percent a year.  He estimated that capital expenses would be approximately $1.27

million, that project management expenses would be 10 percent of gross sales revenue, that sales expenses would be 8.5 percent of gross sales revenue (i.e., commissions of 7 percent and closing costs of 1.5 percent), and that developer's profit would be 15 percent.  He used a discount rate of 20 percent.

### c.  Analysis

We shall use those estimates from our analysis of the after value of the property that are not related to the number of lots in the development.  We shall assume that the lots appreciate at 10 percent, that project management expenses are 10 percent of gross sales revenue, that sales expenses are 8 percent of gross sales revenue (i.e., commissions of 7 percent and closing costs of 1 percent), and that developer's profit is 15 percent.

We shall use the following estimates to calculate the present value of a 40-lot residential subdivision.

### (1)  Lot Prices

In contrast to their sharp dispute over lot prices in the 21-lot shared ranch, Messrs. Garone and Lengel hardly disagreed about lot prices in the 40-lot subdivision.  They did, however, disagree about the optimal placement of the lots.  Mr. Lengel assumed that all 40 lots could be placed along the river "on approximately 15 to 20 percent of the subject property with the remainder of the site being unencumbered open space for the use and enjoyment of the lot owners."  That is, he assumed each lot

would be between 1.25 and 2 acres.  (Mr. Garone assumed each lot would be 5 acres.)  We recall that a developer, to subdivide the property into any more than 22 lots, would have needed to apply under MIP and not LPIP.  Under MIP, however, a developer would have needed to preserve only 50 percent of the land.  Mr. Lengel failed to explain why a developer would have restricted itself to between 15 to 20 percent of the land when as much as 50 percent of the land was available.  Mr. Lengel provided no evidence that such a dense configuration on the river was even possible, and Mr. Garone doubted the riverfront could accommodate the necessary wells and septic systems.  We find Mr. Lengel's configuration unnecessarily restrictive and so find his estimate of $300,000 for all 40 lots unreliable.

We find Mr. Garone's analysis more convincing because we find his proposed configuration more likely; that is, 22 lots along the river (the actual configuration at Gunnison Riverbanks Ranch) plus 18 lots not on the river.  Nonetheless, Mr. Garone did not explain why east river lots would sell at a premium to west river lots, and the other experts made no such distinction.  Indeed, Mr. Garone himself made no such distinction in his analysis of a 22-lot subdivision.  We shall assume that buffer lots would sell for $200,000 and that river lots would sell for $350,000.  Our conclusion, however, hardly conflicts with that of Mr. Lengel:  The undiscounted value of Mr. Lengel's gross sales

revenue ($12 million)[9] and the undiscounted value of our gross sales revenue ($11.3 million)[10] differ by only $700,000.

### (2)  Absorption

Because both experts do so, we shall assume that all the lots are sold in 9 years.  The absorption rates of the two experts are broadly similar, but again we find that Mr. Lengel's assumptions are slightly aggressive.  Mr. Garone's absorption rate is quite close to the absorption rate Mr. Nash reported for Hidden River Ranch (14 lots in 3 years), which included lots both with and without river frontage.  We find Hidden River Ranch to be similar to, but (given the inferior East River) less desirable than, the 40-lot subdivision here.  Thus, Mr. Garone's slightly faster absorption rate seems reasonable.  We shall adopt Mr. Garone's estimates.

### (3)  Capital Expenses

To calculate capital expenses, Mr. Lengel started with the actual expenses the partnership incurred developing the property (approximately $2.23 million) and subtracted two expenses (a finder's fee for petitioner and costs related to the conservation easement), which left him with development costs of approximately $2.13 million.  After adding approximately $420,000 to account

---

[9]$12 million = $300,000 per lot x 40 lots.

[10]$11.3 million = ($200,000 per lot x 18 lots) + ($350,000 per lot x 22 lots).

for the increased expenses related to the additional lots, he concluded capital expenses would be $2.55 million. Mr. Garone had a much lower estimate for capital expenses: approximately $1.27 million. That figure comes from a supplement to his report that provides a detailed comparison of capital expenses for five different development plans, all derived from the partnership's actual expenses. (In his discounted cashflow analysis, for some reason, Mr. Garone separately calculated "Estimated Project Costs", which he found to be approximately $1.24 million. We prefer his more detailed supplement.)

In the supplement, Mr. Garone started with the actual expenses the partnership incurred, increased some expenses to reflect the greater cost of developing more lots, and subtracted other expenses that, in his opinion, were "not appropriate for the development model". At trial, Mr. Garone explained why the excluded expenses would not have been necessary, and we found some of his testimony convincing. For example, Mr. Garone excluded all the expenses related to the renovation of the clubhouse. Yet Mr. Garone failed to explain his reasons for excluding other costs. Although we find that Mr. Lengel failed to justify both his use of nearly all the partnership's expenses and his additional $420,000 upward adjustment, we also find that Mr. Garone failed to justify his exclusion of many expenses beyond those related to the clubhouse. We shall start with Mr.

Garone's estimate of capital expenses and add back certain expenses (those not related to the clubhouse and not excluded by Mr. Lengel). We thereby calculate capital expenses to be approximately $1.87 million.

### (4) Discount Rate

Mr. Garone used a discount rate of 20 percent to account for the risk associated with developing 40 lots. Yet he also used a discount rate of 20 percent for his 60-lot residential subdivision. That is, Mr. Garone argued that developing 60 lots involved no more risk than developing 40 lots, but developing 40 lots involved substantially more risk than developing 22 lots. We are not convinced. We shall again use a discount rate of 15 percent.

### (5) River Corridor Conservation Easement

In his supplemental report, Mr. Lengel asserted that the partnership could have sold a conservation easement protecting the river corridor for $1.5 million. Nonetheless, in an addendum to that report, he stated that, contrary to his previous understanding, no government entity had made any offer to purchase such a conservation easement. We find that petitioner failed to show that a developer would have been likely to sell such a conservation easement for such a large sum.

d.  Conclusion

We conclude that the 40-lot residential subdivision had, at the time of the donation of the conservation easement, a present value of approximately $4.45 million.  See the appendix for our discounted cashflow analysis.

F.  The Value of the Conservation Easement

We find that Gunnison Riverbanks Ranch was worth $4.45 million (as a 40-lot residential subdivision) before the imposition of the conservation easement and was worth $3.89 million (as a 21-lot shared ranch) after the imposition of the conservation easement.  The value of the conservation easement is the difference:  $560,000 (and we so find).

III.  The Percentage Limitation Rules of Section 170(b)(1)

By the notice, respondent determined that any charitable contribution deduction is subject to the limitations in section 170(b)(1)(B) and not those in section 170(b)(1)(A).  The general rule of section 170(b)(1)(A) is that "Any charitable contribution to * * * [certain organizations is] allowed to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year."  The general rule of section 170(b)(1)(B) is that charitable contributions other than those to which section 170(b)(1)(A) applies are

> allowed to the extent that the aggregate of such
> contributions does not exceed the lesser of--

(i) 30 percent of the taxpayer's contribution base for the taxable year, or

(ii) the excess of 50 percent of the taxpayer's contribution base for the taxable year over the amount of charitable contributions allowable under subparagraph (A) * * *

Petitioner did not in the petition assign error to respondent's determination with respect to the percentage limitation.  That is enough for us to deem the issue conceded.  See Rule 241(d)(1)(C).  Moreover, he did not raise the issue at trial or in his opening brief.  In his reply brief, however, petitioner argues that we do not have jurisdiction to decide the issue because the issue turns on questions of fact specific to the partners.  That is, petitioner argues that the issue is not a partnership item, see sec. 6231(a)(3), but a nonpartnership item, see sec. 6231(a)(4).  We disagree.  To decide whether the charitable contribution here falls under subparagraph (A) or (B) of section 170(b)(1), all we must decide is to what kind of organization the partnership donated the conservation easement.  See sec. 170(b)(1)(A) and (B).  That question is best answered at the partnership level and so is a partnership item.  See sec. 6231(a)(3).  Petitioner has presented no evidence or argument with respect to that question.  We find against him.

IV.  Conclusion

The conservation easement was worth $560,000, and so the partnership made a contribution in that amount.  The percentage limitations in section 170(b)(1)(B) apply.

An appropriate decision
will be entered.

APPENDIX

Trout Ranch Discounted Cashflow Analysis--40 Lots

| **Assumptions** | | **Lot Prices** | | | **Absorption Rate** | | | |
|---|---|---|---|---|---|---|---|---|
| Discount rate | 15% | Buffer | $200,000 | | Year | Buffer | West | East | TOTALS |
| Commissions | 7% | West river | 350,000 | | 1 | 0 | 0 | 0 | 0 |
| Closing costs | 1% | East river | 350,000 | | 2 | 3 | 2 | 1 | 6 |
| Sales expenses | 8% | | | | 3 | 3 | 1 | 2 | 6 |
| Developer's profit | 15% | Capital expenses | | | 4 | 2 | 2 | 1 | 5 |
| Project management | 10% | | (1,870,000) | | 5 | 2 | 1 | 2 | 5 |
| Appreciation | 10% | | | | 6 | 2 | 2 | 1 | 5 |
| | | | | | 7 | 2 | 1 | 2 | 5 |
| | | | | | 8 | 2 | 2 | 1 | 5 |
| | | | | | 9 | 2 | 1 | 0 | 3 |
| | | | | Totals | | 18 | 12 | 10 | 40 |

| **Year Sales** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| --Buffer | 0 | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 18 |
| Lot price | $200,000 | $200,000 | $242,000 | $266,200 | $292,820 | $322,102 | $354,312 | $389,743 | $428,718 | |
| Revenue | 0 | 660,000 | 726,000 | 532,400 | 585,640 | 644,204 | 708,624 | 779,487 | 857,436 | $5,493,791 |
| --West river | 0 | 2 | 1 | 2 | 1 | 2 | 1 | 2 | 1 | 12 |
| Lot price | 350,000 | 385,000 | 423,500 | 465,850 | 512,435 | 563,679 | 620,046 | 682,051 | 750,256 | |
| Revenue | 0 | 770,000 | 423,500 | 931,700 | 512,435 | 1,127,357 | 620,046 | 1,364,102 | 750,256 | 6,499,396 |
| --East river | 0 | 1 | 2 | 1 | 2 | 1 | 2 | 1 | 0 | 10 |
| Lot price | 350,000 | 385,000 | 423,500 | 465,850 | 512,435 | 563,679 | 620,046 | 682,051 | 750,256 | |
| Revenue | 0 | 385,000 | 847,000 | 465,850 | 1,024,870 | 563,679 | 1,240,093 | 682,051 | 0 | 5,208,542 |
| **Gross sales revenue** | 0 | 1,815,000 | 1,996,500 | 1,929,950 | 2,122,945 | 2,335,240 | 2,568,763 | 2,825,640 | 1,607,692 | 17,201,729 |
| **Sales expenses** | 0 | (145,200) | (159,720) | (154,396) | (169,836) | (186,819) | (205,501) | (226,051) | (128,615) | (1,376,138) |
| **Capital expenses** | (1,870,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,870,000) |
| **Project management** | 0 | (181,500) | (199,650) | (192,995) | (212,295) | (233,524) | (256,876) | (282,564) | (160,769) | (1,720,173) |
| **Developer's profit** | 0 | (272,250) | (299,475) | (289,493) | (318,442) | (350,286) | (385,315) | (423,846) | (241,154) | (2,580,259) |
| **Net sales revenue** | (1,870,000) | 1,216,050 | 1,337,655 | 1,293,067 | 1,422,373 | 1,564,611 | 1,721,072 | 1,893,179 | 1,077,154 | 9,655,159 |
| **Present value** | (1,870,000) | 1,057,435 | 1,011,459 | 850,212 | 813,246 | 777,888 | 744,067 | 711,716 | 352,123 | 4,448,147 |

Trout Ranch Discounted Cashflow Analysis--21 Lots

| **Assumptions** | | **Lot Prices** | | **Absorption Rate** | | | |
|---|---|---|---|---|---|---|---|
| Discount rate | 15% | West river | $490,000 | Year | West | East | Totals |
| Commissions | 7% | East river | 490,000 | 1 | 0 | 0 | 0 |
| Closing costs | 1% | | | 2 | 3 | 2 | 5 |
| Sales expenses | 8% | | | 3 | 2 | 2 | 4 |
| Developer's profit | 15% | Capital expenses | | 4 | 2 | 2 | 4 |
| Project management | 10% | | (2,180,000) | 5 | 2 | 2 | 4 |
| Appreciation | 10% | | | 6 | 2 | 2 | 4 |
| | | | | 7 | 0 | 0 | 0 |
| | | | | 8 | 0 | 0 | 0 |
| | | | | 9 | 0 | 0 | 0 |
| | | | | **Totals** | 11 | 10 | 21 |

| **Year Sales** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| --West river | 0 | 3 | 2 | 2 | 2 | 2 | 0 | 0 | 0 | 11 |
| Lot price | $490,000 | $539,000 | $592,900 | $652,190 | $717,409 | $789,150 | $868,065 | $954,871 | $1,050,359 | |
| Revenue | 0 | 1,617,000 | 1,185,800 | 1,304,380 | 1,434,818 | 1,578,300 | 0 | 0 | 0 | $7,120,298 |
| --East river | 0 | 2 | 2 | 2 | 2 | 2 | 0 | 0 | 0 | 10 |
| Lot price | 490,000 | 539,000 | 592,900 | 652,190 | 717,409 | 789,150 | 868,065 | 954,871 | 1,050,359 | |
| Revenue | 0 | 1,078,000 | 1,185,800 | 1,304,380 | 1,434,818 | 1,578,300 | 0 | 0 | 0 | 6,581,298 |
| **Gross sales revenue** | 0 | 2,695,000 | 2,371,600 | 2,608,760 | 2,869,636 | 3,156,600 | 0 | 0 | 0 | 13,701,596 |
| **Sales expenses** | 0 | (215,600) | (189,728) | (208,701) | (229,571) | (252,528) | 0 | 0 | 0 | (1,096,128) |
| **Capital expenses** | (2,180,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2,180,000) |
| **Project management** | 0 | (269,500) | (237,160) | (260,876) | (286,964) | (315,660) | 0 | 0 | 0 | (1,370,160) |
| **Developer's profit** | 0 | (404,250) | (355,740) | (391,314) | (430,445) | (473,490) | 0 | 0 | 0 | (2,055,239) |
| **Net sales revenue** | (2,180,000) | 1,805,650 | 1,588,972 | 1,747,869 | 1,922,656 | 2,114,922 | 0 | 0 | 0 | 7,000,069 |
| **Present value** | (2,180,000) | 1,570,130 | 1,201,491 | 1,149,252 | 1,099,285 | 1,051,490 | 0 | 0 | 0 | 3,891,648 |